UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

TRAVIS A. WILLIAMS,

    Plaintiff,

v.                                        Case No. 21-cv-240-pp

JOHN BIRDYSHAW,

    Defendant.

**ORDER DENYING PLAINTIFF'S MOTION TO WITHDRAW (DKT. NO. 45), GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 38) AND DISMISSING CASE**

      Plaintiff Travis A. Williams, who is incarcerated at the Wisconsin Secure Program Facility and is representing himself, is proceeding under 42 U.S.C. §1983 on an Eighth Amendment claim against a correctional officer at Waupun Correctional Institution, where the plaintiff was incarcerated when he filed his complaint. The court previously granted summary judgment in favor of all but one defendant. Dkt. No. 29. The remaining defendant, correctional officer John Birdyshaw, moves for summary judgment on the merits of the remaining claim against him. Dkt. No. 38. The plaintiff has not opposed the motion, instead filing his own motion to "withdraw" the case. Dkt. No. 45. The court will deny the plaintiff's motion to withdraw, grant the defendant's motion and dismiss the case.

**I.  Facts**

   A. <u>Procedural Background</u>[1]

On June 14, 2023, the court issued an amended scheduling order setting new deadlines for the plaintiff and the remaining defendant to complete discovery and file dispositive motions on the merits of the plaintiff's remaining claim. Dkt. No. 30. The court ordered the parties to file dispositive motions by November 13, 2023. <u>Id.</u> at 2. On November 13, 2023, the court granted the defendant's motion to extend that deadline to November 27, 2023. Dkt. No. 37.

At the November 27, 2023 deadline, the defendant filed his motion for summary judgment. Dkt. No. 38. The next day, the court ordered the plaintiff to file his materials in response to the defendant's motion by the end of the day on December 27, 2023. Dkt. No. 43. The court advised the plaintiff that if it did not receive his response materials by the December 27, 2023 deadline, the court would "treat the defendant's motion as unopposed, accept all facts the defendant assert[s] as undisputed and decide the motion based only on the arguments in the defendant's brief, without any input from the plaintiff." <u>Id.</u> at 2. The court had given the plaintiff this same warning in the previous order instructing the plaintiff to respond to the defendants' motion for partial summary judgment on exhaustion grounds. <u>See</u> Dkt. No. 23 at 2. The court added to the November 28, 2023 order that because the plaintiff had "a history of failing to file documents by deadlines the court has set or failing to comply

---

[1] The court detailed the procedural history in its order granting the defendants' motion for partial summary judgment. Dkt. No. 29 at 2–3. This order discusses the procedural history since the court issued that order.

with court orders, the court also has the authority to dismiss the case as a sanction for plaintiff's failure to timely file a response in opposition to the motion for summary judgment." Dkt. No. 43 at 2 (citing Civil Local Rule 56(b)(9) (E.D. Wis.)).

The plaintiff did not respond to the defendant's motion. Instead, at the December 27, 2023 deadline, the court received the plaintiff's "motion for withdraw." Dkt. No. 45. The plaintiff asks the court "to withdraw the case for reasons Because [he] do[esn't] have the request form and other report to prove the case." Id. The defendant has not responded to this motion.

B.     Plaintiff's Motion to Withdraw (Dkt. No. 45)

The court twice warned the plaintiff that if he did not respond to the defendant's (or the defendants') motion for summary judgment, the court would treat the defendant's proposed findings of fact as undisputed and likely would grant the defendant's motion. The court previously followed through on that warning when it granted the defendants' motion for partial summary judgment after the plaintiff failed to respond to it. The plaintiff again has not filed a response to the defendant's summary judgment motion, instead he asks the court to allow him to withdraw this case. The plaintiff has done this before, filing a motion to withdraw in lieu of a response to the defendants' motion for partial summary judgment. Dkt. No. 24. The court granted that motion and allowed the plaintiff to withdraw his claim against defendant Bryanna Turner. Dkt. No. 29 at 3–4. The court explained that because the defendants had moved for summary judgment, the plaintiff could dismiss Turner "only by court

order, on terms that the court considers proper." Id. at 4 (quoting Fed. R. Civ. P. 41(a)(2)). The court granted the plaintiff's motion and dismissed defendant Turner without prejudice under Rule 41(a)(2). Id.

The plaintiff repeatedly has failed to comply with court orders and respond to the defendants' motions for summary judgment. Like the plaintiff's first motion to withdraw, his second motion to withdraw arguably serves as his response to the defendant's motion for summary judgment. Id. But this second motion does not comply with the court's previous order (Dkt. No. 43) and provides very little information. The plaintiff says he does not have a request form or report, but he does not say what form or report he needs to enable him to "prove the case." The defendant gave the plaintiff a copy of the incident reports as an exhibit attached to one of his declarations in support of his motion for summary judgment. Dkt. Nos. 42-1 (Incident Reports), 38-1 (Certificate of Service). The plaintiff does not identify any other report he needed to respond to the defendant's motion, or to survive summary judgment.

The court will deny the plaintiff's motion to withdraw the case, because that would constitute a dismissal without prejudice. See Fed. R. Civ. P. 41(a)(2). The court will enforce its previous order, accept the defendant's proposed facts as undisputed and decide the motion for summary judgment without the plaintiff's input.

C.   Factual Background

1.   *The Amended Complaint*

The amended complaint named three defendants and alleged harm from several other correctional officers at Waupun. Dkt. No. 13 at 4. As noted above, correctional officer Birdyshaw is the only remaining defendant. The plaintiff alleged that on November 27, 2020, while he was in restricted housing at Waupun, he passed out while experiencing severe stomach pain and after vomiting blood. Id. (citing Dkt. No. 10 at ¶¶1–9). He later awoke to multiple officers in his cell, one of whom was the defendant. Id. (citing Dkt. No. 10 at ¶¶9–12). He alleged that the officers treated him as a "'Disruptive inmate'" and used significant force on him. Id. at 5 (quoting Dkt. No. 10 at ¶¶13–14). Specific to the defendant, he alleged

> that Birdyshaw "was twisting [his] wrist as an Inmate that was disobeying order and being Disruptive very excessive us[]ing a[ ]lot of force that was not needed for this matter." The plaintiff alleges that "the CO continued to be excessive" by twisting his wrist "extrem[e]ly hard [while] pulling and yanking [his] head back very hard making it very hard for [him] to breathe" and making him gasp for air. He says neither Sancez [*sic*] nor Nelson told Birdyshaw to stop despite hearing the plaintiff's yelling in pain and seeing him continue to vomit blood.

Id. (quoting Dkt. No. 10 at ¶¶15–17) (internal citations omitted). The officers took the plaintiff to the Health Services Unit, where a doctor recommended placing the plaintiff in an observation cell. Id. (citing Dkt. No. 10 at ¶18). The plaintiff alleged that officers instead placed him in a strip cage and that the defendant tightly chained his hands to the strip cage door behind his back and applied leg restraints. Id. at 5–6 (citing Dkt. No. 10 at ¶19). The plaintiff alleged

that the defendant told him to sit facing forward, which the plaintiff had difficulty doing. Id. at 6 (citing Dkt. No. 10 at ¶20). The plaintiff asserted that he was still vomiting blood, crying and asking if he could be handcuffed in front of his body. Id. He said the defendant told him "'no make it work.'" Id. (quoting Dkt. No. 10 at ¶20). The plaintiff alleged that he suffered injuries to his wrist, neck and legs. Id. (citing Dkt. No. 10 at ¶22). He said that the next day, he asked the officer (whom the court inferred was the defendant) "'why was he so excessive.'" Id. (quoting Dkt. No. 10 at ¶25). The defendant allegedly told the plaintiff, "'next time you will think about that before you fake.'" Id. The court allowed the plaintiff to proceed on an Eighth Amendment claim that the defendant used excessive force against him during and after the cell extraction. Id. at 9–10.

### 2. *The Defendant's Undisputed Facts*

The defendant was employed as a correctional officer at Waupun during the relevant time. Dkt. No. 40 at ¶2. The plaintiff was incarcerated at Waupun and housed in the Restrictive Housing Unit (RHU). Id. at ¶¶1, 3. The RHU houses incarcerated persons who "typically present a high security risk, including injury to others and/or self-injury." Id. at ¶5.

On November 27, 2020, the defendant was working in the RHU. Id. at ¶6. At around 11:30 a.m., he heard Sergeant Mark Puterbaugh call over the radio for extra staff to bring restraints to the plaintiff's cell. Id. at ¶7. When the defendant arrived at the plaintiff's cell, he heard the sergeant repeatedly call to the plaintiff and direct him to come to the door so staff could put him in

restraints and take him to the Health Services Unit. Id. at ¶8. The defendant explains that every person incarcerated in the RHU is restrained before staff remove them from their cells, even in an emergency. Id. at ¶11. This is for the safety of staff and the incarcerated persons. Id. When the plaintiff did not respond to the sergeant, the defendant and the other officers present donned personal protective equipment to enter the plaintiff's cell for an emergency cell extraction. Id. at ¶9.

The defendant was the third staff member to enter the cell behind two other correctional officers. Id. at ¶12. When he entered the plaintiff's cell, he saw the plaintiff "on his back with blood on the floor." Id. at ¶10. The defendant used his radio to call for a supervisor to report to the cell because the plaintiff was unresponsive. Id. Other officers secured the plaintiff's arms and legs and applied handcuffs. Id. at ¶13. Sergeant Puterbaugh applied ankle restraints. Id. The defendant secured the plaintiff's right forearm below his elbow "for approximately five seconds to help staff restrain him." Id. at ¶14. He later secured the plaintiff's upper right arm so he could assist the plaintiff into a wheelchair that staff would use to take the plaintiff to the Health Services Unit. Id. at ¶15. The defendant did not touch any other part of the plaintiff's body during the emergency extraction. Id. at ¶16. The defendant avers that he "did not twist or even contact [the plaintiff's] wrist," and he "did not yank or even contact [the plaintiff's] head at any point during the extraction." Dkt. No. 41 at ¶18.

### 3. *Video Exhibits*

The defendant provided two video exhibits of body-worn camera (BWC) footage taken from two officers during the November 27, 2020, emergency cell extraction. Dkt. Nos. 42-2, 42-3.

#### a. Exhibit 1006 – The Defendant's BWC

The first video exhibit shows footage from the defendant's BWC. Dkt. No. 42-2 (Ex. 1006). The video begins with the defendant walking down the hall toward the plaintiff's cell, where several officers are standing. Id. at 00:00–0:15. An officer, presumably Puterbaugh, is standing at the front of the cell attempting to speak with the plaintiff. Id. at 0:15–18. The defendant looks into the plaintiff's cell window and then walks back down the hall. Id. at 0:18–0:35. He instructs the other officers to get "pads, helmets." Id. at 0:35–40. The defendant walks to the officers' station to retrieve this equipment. Id. at 0:40–1:00.

At 1:47, an officer opens the plaintiff's trap door in his cell so the defendant can look inside. The defendant then looks down the hall to see the other officers returning to the cell with pads and helmets. Id. at 1:58. The officers enter the plaintiff's cell; the defendant is the third person in, as he avers in his declaration. Id. at 2:41. At 2:48, the defendant briefly grabs the plaintiff's right forearm or wrist with his right hand while other officers apply handcuffs. He is standing over the plaintiff and supporting himself by placing his left arm on the cell wall. Id. at 2:48–2:53. He holds the plaintiff's arm for about five seconds, as he avers in his declaration. Id. The other officers and

medical personnel tend to the plaintiff, who can be heard whimpering and then choking or gagging in the background. Id. at 2:41–5:26. The defendant makes no other contact with the plaintiff during this time. Id. He then briefly helps two other officers lift the plaintiff from the ground and place him slowly and carefully into a wheelchair waiting for him at the front of the cell. Id. at 5:26–5:43. The defendant can be heard saying, "Watch his head, watch his head!" Id. Other officers begin to push the plaintiff out of the cell in the wheelchair. Id. at 5:46. The defendant instructs them, "Slow down, people, slow down!" Id. at 5:46–5:47.

    The defendant exits the cell and watches the other officers cautiously restrain the plaintiff in the wheelchair, telling him to relax. Id. at 5:49–6:02. The defendant briefly reaches his left arm towards the plaintiff, but he does not touch the plaintiff or the wheelchair. Id. at 6:03–6:06. As the officers begin to wheel him away, the plaintiff slumps over. Id. at 6:13–6:19. The defendant helps the other officers by holding the plaintiff upright in the chair, preventing him from falling out. Id. at 6:19–6:44. The plaintiff is twitching, gasping and wriggling, though it is not clear if he is conscious. Id. The defendant moves behind the plaintiff, pulls him back by the shoulders to secure him in the wheelchair and begins to pull the wheelchair backwards while holding the plaintiff in his seat by his left shoulder. Id. at 6:44–7:14. Other officers are holding the plaintiff in the wheelchair, but none of them are twisting at his wrists or yanking him around. Id. The plaintiff continues to gag or gasp. Id.

The defendant rolls the plaintiff backward into an elevator. Id. at 7:14. Other officers enter and help hold the plaintiff in his chair. Id. at 7:14–7:19. The defendant grabs hold of both wheelchair handles and wheels the plaintiff backward out of the elevator, down another hall and into an exam room. Id. at 7:46–8:18. Other officers hold the plaintiff secure in the chair as the defendant pulls it backwards. Id. Medical staff examine the plaintiff, who at first is nonresponsive and has blood on his face and shirt. Id. at 8:18–20:56. The officers, including the defendant, hold the plaintiff or the wheelchair, but none of them can be seen bending the plaintiff's wrist or arm. Id. The defendant occasionally holds the plaintiff's head to assist medical staff during the examination. Id. The plaintiff remains seated in the wheelchair during the medical exam. Id.

At 20:56, the defendant again grabs the wheelchair with both hands and wheels the plaintiff out of the exam room. He wheels the plaintiff down the hall and to a strip cage or observation cell on the same floor as the medical exam room. Id. at 20:56–21:34. He briefly grabs the plaintiff's left arm to help him stand from the wheelchair. Id. at 21:34–21:37. He attaches a tethered handcuff from the cell door to the plaintiff's left wrist, and the plaintiff walks in on his own. Id. at 21:37–21:59. There is a chair in the cell. Id. The defendant says to the plaintiff, "[G]o ahead and sit in that chair [unintelligible]." Id. at 21:54–21:57. The defendant closes the door and turns off his camera. Id. at 21:57–22:04.

10
Case 2:21-cv-00240-PP   Filed 02/27/24   Page 10 of 19   Document 46

b. Exhibit 1007 – Puterbaugh's BWC

This video shows the events before and during the extraction but does not follow the plaintiff to the medical exam. It begins with Puterbaugh walking down the hall towards the plaintiff's cell. Dkt. No. 42-3 (Ex. 1007). He arrives at the cell at 0:25 and calls to the plaintiff multiple times. The plaintiff does not respond, and Puterbaugh calls for other officers. Id. at 0:43. He continues to call to the plaintiff, as other officers arrive. Id. at 0:43–1:30. The defendant arrives at around 1:57 and looks into the cell. At 2:16, the defendant instructs the other officers to grab pads and helmets. Puterbaugh remains at the cell and continues to call to the plaintiff. Id. at 2:16–3:09. At 3:09, the defendant returns to the cell. He is not wearing a helmet and does not have a pad. The other officers return with helmets and pads. Id. at 3:43–4:04.

Puterbaugh moves from the front of the cell door so the officers holding pads can enter first. Id. at 4:06–4:20. At 4:20, the plaintiff's door opens, and the officers rush in. Puterbaugh holds the plaintiff's legs while another officer secures them with ankle restraints. Id. at 4:21–5:08. The defendant can be seen standing above the plaintiff. Id. Other officers turn the plaintiff on his side, while he gags and gasps. Id. at 5:09–6:40. A nurse enters the cell at around 6:40, and she asks the officers to take the plaintiff to the clinic for examination. Id. at 6:40–7:01. The officers, including the defendant, pull the plaintiff to his feet and place him in the nearby wheelchair. Id. at 7:12–7:23. Puterbaugh examines the area of the plaintiff's cell where the plaintiff was

lying. Id. at 7:30–7:44. A splotch of blood can be seen on the wall near the ground where the plaintiff was. Id.

Puterbaugh turns back to where the officers are holding the plaintiff in the wheelchair. Id. at 7:45–7:56. The defendant is standing nearby but is not seen touching the plaintiff. Id. Puterbaugh goes back into the cell, reports to the nurse that there is "white stuff" on the ground and then catches up with the officers escorting the plaintiff down the hall. Id. at 7:57–8:28. The defendant pulls the plaintiff back into his chair by his shoulders and begins pulling the wheelchair down the hall. Id. at 8:28–9:00. Puterbaugh walks up the stairs to the officers' station and turns off his camera. Id. at 9:01–9:15.

## II. Discussion

### A. Summary Judgment Standard

A party is entitled to summary judgment if it shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Material facts" are those that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id.

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To survive a motion for

summary judgment, a non-moving party must show that sufficient evidence exists to allow a jury to return a verdict in its favor. Brummett v. Sinclair Broad. Grp., Inc., 414 F.3d 686, 692 (7th Cir. 2005).

B.  Eighth Amendment

As the court explained in the screening order, the Eighth Amendment governs the plaintiff's claim that the defendant used excessive force when he extracted him from his cell. See generally Wilson v. Seiter, 501 U.S. 294 (1991). "[T]he unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." Hudson v. McMillian, 503 U.S. 1, 5 (1992) (quoting Whitley v. Albers, 475 U.S. 312, 319 (1986)). An Eighth Amendment claim consists of an objective and subjective component. Farmer v. Brennan, 511 U.S. 825, 834 (1994). In the context of the plaintiff's claim of excessive force, he must show both that (1) "the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation," and (2) the defendant "'act[ed] with a sufficiently culpable state of mind.'" Hudson, 503 U.S. at 8 (quoting Wilson, 501 U.S. at 298, 303).

The court considers several factors when determining whether the use of force in a prison setting was excessive. See McCottrell v. White, 933 F.3d 651, 663 (7th Cir. 2019). These factors include

> (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response.

Id. (citing Whitley, 475 U.S. at 321). The "core judicial inquiry" is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson, 503 U.S. at 6 (citing Whitley, 475 U.S. at 320–21).

C.  Analysis[2]

The defendant's declaration discusses his contact with the plaintiff during the extraction only. He does not discuss the contact he had with the plaintiff after the extraction or during and after the medical exam. The video exhibits show that the defendant had contact with the plaintiff after the extraction and during his medical examination. But no reasonable jury could conclude that any of this contact was excessive or that the defendant used force maliciously or sadistically to cause the plaintiff harm.

The video evidence shows several officers enter the plaintiff's cell when he was not responsive to their calls from outside his cell. The defendant enters and briefly holds the plaintiff's right arm back so other officers can apply handcuffs. He does not twist the plaintiff's wrist, and he is not the officer who applies the handcuffs. The defendant stands over the plaintiff who is on the ground, and he uses one arm to hold the plaintiff's right arm while holding

---

[2] Because the plaintiff did not respond to the defendant's proposed facts, the court accepts those facts as true. The court will disregard the defendant's version of the facts or the allegations from the amended complaint if they are inconsistent with what the video exhibits show. See Scott v. Harris, 550 U.S. 372, 380–81 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

himself upright with his other arm pressed against the cell wall. The defendant holds the plaintiff's right arm for only about five seconds while another officer applies handcuffs. He remains standing over the plaintiff for a few minutes as the other officers restrain the plaintiff and tend to him. He then helps the other officers lift the plaintiff from the floor and guide him into a wheelchair. The officers carefully and gently help the plaintiff sit into the chair. They do not pull on his wrists, yank at his arms or twist his body parts while they restrain him and help him into the wheelchair. The defendant tells the other officers to watch the plaintiff's head and to slow down when they quickly wheel him out of the cell.

The video shows the defendant holding the plaintiff while he pushes or pulls the plaintiff's wheelchair down a hall, into an elevator and then into the medical exam room. The defendant does not use significant force and holds the plaintiff back in his chair only to keep him from falling out forward. The defendant holds the plaintiff by his shoulder or shoulders; he does not "yank on his head and neck" as the amended complaint alleges. At one point, the defendant forcefully pulls the plaintiff back into the chair so that he is upright instead of slumped down over the front of the chair. Although this movement is more forceful, the defendant pulls the plaintiff by his shoulders, not by his head or neck, and he does so to ensure the plaintiff is securely in the wheelchair and will not fall forward out of the chair. Nothing about this movement appears malicious, sadistic or intended to harm the plaintiff. If

anything, it appears intended to avoid harm to the plaintiff by falling out of the chair because of his forward slumping.

During the medical exam, the defendant occasionally holds the plaintiff's head back so medical staff can examine him. But the video shows that the defendant does not use more force than necessary and does not yank the plaintiff's head back. When the medical exam is over, the defendant wheels the plaintiff to a new cell down the hall. He briefly grabs the plaintiff's arm as he helps him to his feet, attaches a tethered handcuff from the cell door to the plaintiff's wrist and helps guide him into the cell. The video does not suggest that the defendant applied this handcuff "extremely tight" as the amended complaint alleged. The video evidence also contradicts the plaintiff's allegations that the defendant placed a chair inside the cell and ordered the plaintiff to find a way to sit forward while handcuffed. The video shows that there is a chair already in the cell when the officers wheel the plaintiff there. The defendant attaches the tethered handcuff but does not apply leg restraints, which are still on from the cell extraction. The defendant and the plaintiff do not have any conversation, and the defendant does not tell the plaintiff to "find a way" to sit facing forward or to "make it work." The plaintiff is not vomiting blood or crying, as he alleged in the amended complaint.

The undisputed evidence, including the video exhibits, paints a very different picture of the events than what the plaintiff alleged in his amended complaint. No reasonable jury viewing this evidence could conclude that the defendant used excessive force. The evidence shows that officers were confronted

16

Case 2:21-cv-00240-PP   Filed 02/27/24   Page 16 of 19   Document 46

with a medical emergency and a nonresponsive incarcerated person in the RHU, which houses high-security-risk persons. Officers entered the plaintiff's cell to restrain and safely extract him so that they could take him to the Health Services Unit for medical attention. During this extraction, the defendant briefly held the plaintiff's right arm so that other officers could apply handcuffs and other restraints. The defendant did not twist the plaintiff's wrist, did not yank his head or neck and did not use more force than was necessary to restrain or assist the plaintiff, who was unresponsive and limp during the extraction. The defendant remained calm during the extraction and even instructed other officers to slow down or be more careful with how they were handling the plaintiff.

After the extraction, the defendant used care when holding the plaintiff in the wheelchair, and he instructed other officers where to stand or hold the plaintiff to ensure he did not fall out of the chair. He assisted medical staff by holding the plaintiff's head up so they could take his vitals, examine his airway and provide treatment. When he took the plaintiff to the strip cage or observation cell after the exam, he again carefully helped lift the plaintiff from the wheelchair and guided him into the cell. He did not order the plaintiff to face forward or deny the plaintiff's requests to handcuff him in front of his body instead of behind him. Although he was required to use some force during these events, the evidence does not allow the conclusion that the plaintiff's use of force was wanton, unnecessary, malicious or intended to harm the plaintiff.

The undisputed evidence would not allow a reasonable jury to conclude that the defendant used excessive force on the plaintiff during or after the emergency cell extraction on November 27, 2020. The defendant is entitled to judgment as a matter of law.[3]

### III. Conclusion

The court **DENIES** the plaintiff's motion to withdraw the case. Dkt. No. 45.

The court **GRANTS** the defendant's motion for summary judgment. Dkt. No. 38.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. R. App. P. 4(a)(5)(A).

If the plaintiff appeals, he will be liable for the $605 appellate filing fee regardless of the outcome of the appeal. If the plaintiff seeks to proceed on

---

[3] The defendant argues that if the court declines to grant summary judgment in his favor, he is entitled to qualified immunity. "Where a defendant 'wins on the facts, [she] does not need qualified immunity.'" Sierra-Lopez v. County, Case No. 17-cv-1222, 2019 WL 3501540, at *10 (E.D. Wis. July 31, 2019) (quoting Viero v. Bufano, 925 F. Supp. 1374, 1387 (N.D. Ill. 1996); and Antepenko v. Domrois, Case No. 17-cv-1211, 2018 WL 6065347, at *6 (E.D. Wis. Nov. 20, 2018)).

appeal without prepaying the appellate filing fee, he must file a motion in *this court.* See Fed. R. App. P. 24(a)(1). The Court of Appeals may assess the plaintiff a "strike" if it concludes that his appeal has no merit. If the plaintiff accumulates three strikes, he will not be able to file a case in federal court (except a petition for *habeas corpus* relief) without prepaying the full filing fee unless he demonstrates that he is in imminent danger of serious physical injury. Id.

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Rule 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2). Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 27th day of February, 2024.

**BY THE COURT:**

_____
**HON. PAMELA PEPPER**
**United States District Judge**